# NO. 12-23-00096-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE* |
| | § | *COUNTY COURT AT LAW NO. 1* |
| *A.E., A CHILD* | § | *HENDERSON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

J.E. appeals the trial court's judgment terminating his parental rights to A.E. In two issues, J.E. argues that the evidence is legally and factually insufficient to support the trial court's judgment. We affirm.

## BACKGROUND

J.E. is the father of A.E. A.E.'s mother is deceased. On January 24, 2022, the Texas Department of Family and Protective Services (the Department) filed an original petition for protection of A.E., for conservatorship, and for termination of J.E.'s parental rights. The Department further sought a writ of attachment to gain possession of A.E. in the interest of her physical health and safety. In its petition, the Department alleged, in pertinent part, that J.E.'s parental rights should be terminated for the following reasons: (1) he voluntarily left A.E. alone or in the possession of another without providing adequate support for A.E. and remained away for a period of least six months; (2) he knowingly placed or allowed A.E. to remain in conditions or surroundings which endangered her physical or emotional well-being; and (3) he engaged in conduct or knowingly placed A.E. with persons who engaged in conduct which endangered her physical or emotional well-being.

Following a jury trial, the jury found that J.E.'s parental rights should be terminated based on findings that clear and convincing evidence supports such termination pursuant to Texas Family Code, Section 161.001(b)(1)(D), (E), and (O) and that such termination is in

1

A.E.'s best interest. The trial court entered a judgment in accordance with the jury's verdict, and this appeal followed.

## EVIDENTIARY SUFFICIENCY

In his first issue, J.E. argues that the evidence is legally and factually insufficient to support the trial court's judgment terminating his parental rights to A.E under Section 161.001(b)(D) and (E). J.E. makes no argument regarding the sufficiency of the evidence related to the jury's finding that termination of his parental rights was in A.E.'s best interest.[1]

### Standard of Review and Governing Law

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders "the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the Texas Family Code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West 2022); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the second subsection of the statute. TEX. FAM. CODE ANN. § 161.001(b)(1); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure of degree of proof that will

---

[1] Because J.E. has not challenged the "best interest" element on appeal, we do not address it. *Cf. In re S.L.*, 421 S.W.3d 34, 37 (Tex. App.–Waco 2013, no pet.).

produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2019). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

When confronted with both a legal and factual sufficiency challenge, an appellate court first must review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id.*

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder reasonably could form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the evidence presented to the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id.* at 27–29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

## Termination under Sections 161.001(b)(1)(D) and (E)

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Subsection (D) addresses the child's surroundings and environment. *In re N.R.*, 101 S.W.3d 771, 775–76 (Tex. App.–Texarkana 2003, no pet.). The child's "environment" refers to the suitability of the child's living conditions, as well as the conduct of parents or others in the home. *In re S.R.*, 452 S.W.3d 351,

360 (Tex. App.–Houston [14th Dist.] 2014, pet. denied). The relevant time frame to determine whether there is clear and convincing evidence of endangerment is before the child was removed. *Ybarra v. Tex. Dep't of Human Servs.*, 869 S.W.2d 574, 577 (Tex. App.–Corpus Christi 1993, no pet.). Further, subsection (D) permits termination based on a single act or omission. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.–San Antonio 1997, pet. denied).

The trial court also may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(E). "Endanger" means to expose to loss or injury or to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). It is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Id.* Termination under subsection (E) must be based on more than a single act or omission. *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.–Fort Worth 2000, pet. denied). Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.–Dallas 2003, pet. denied). Scienter is not required for an appellant's own acts under Section 161.001(b)(1)(E), although it is required when a parent places the child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.–Houston [14th Dist.] 2003, pet. denied), *overruled on other grounds*, *In re L.C.L.*, 599 S.W.3d 79, 85–86 (Tex. App.–Houston [14th Dist.] 2020, pet. denied).

Generally, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of the child. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.–Fort Worth 2004, pet. denied). Though imprisonment of a parent is insufficient, standing alone, to constitute "engaging in conduct which endangers the emotional or physical well-being of the child," it is a factor to consider on the issue of endangerment. *See Boyd*, 727 S.W.2d at 533–35. Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under subsection (E). *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App–Houston [1st Dist.] 2009, pet. denied). Domestic violence, want of self-control, and propensity for violence may be considered evidence of endangerment. *In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.–Eastland 2010, pet. denied); *see also In re B.J.B.*, 546 S.W.2d 674, 677 (Tex. App.–Texarkana 1977, writ ref'd n.r.e.) (considering parent's lack of self-control and propensity for violence and

aggression).  "Being exposed to violence can endanger the children even if they are not the targets of the violence. ***C.W. v. Tex. Dep't of Family & Protective Servs.***, No. 03-14-00746-CV, 2015 WL 1967945, at *2–3 (Tex. App.–Austin May 1, 2015, no pet.) (mem. op.).

*Instability*

In the instant case, J.E. states in his brief that he was convicted and incarcerated multiple times in Michigan, and he testified that he was incarcerated at the time A.E. was born.  Indeed, former Department Investigations worker Candice Roberts testified that between 1995 and 2019, J.E. had twenty-four convictions in Michigan, eight of which were felonies.  And the record reflects that J.E.'s criminal history in Michigan includes a sex crime, several felony home invasions, aggravated assault, fraud, felony witness tampering, felony receipt of stolen property, felony assault on a police officer, driving without a license, and obstruction.

Moreover, in January 2021 after he moved to Texas, J.E. was arrested after he went to a home for sex with a person with whom he communicated online.  When a fourteen-year-old girl answered the door, J.E. asked to see her parents.  He left after conversing with a man who claimed to be the girl's father.  Thereafter, the homeowners contacted the police and stated that J.E. impersonated a police officer.  Approximately three months later, J.E. was the subject of a police investigation when his vehicle was observed on-camera during a copper theft and fellow suspects identified him as an accomplice.  During that investigation, officers discovered J.E. and A.E. were living in a recently-stolen travel trailer, for which J.E. produced a suspect bill of sale. While seizing the trailer, investigators discovered a glass water-pipe used for inhaling methamphetamine, as well as a baggy containing marijuana and methamphetamine.  J.E. was charged with possession of stolen property, possession of a controlled substance, penalty group 1, four to 200 grams (the aggregate weight of the water in the pipe), and possession of controlled substance, penalty group 1, one to four grams (the methamphetamine in the baggy).

Following his arrest, despite evidence he had an income in 2018 of $155,000, a $400,000 inheritance, $45,000 from a home sale in Michigan,[2] and that he lived with family until approximately eight months before his current incarceration, J.E. failed to pay his bondsman, and his bond was revoked in January 2022.  While J.E. claimed he left A.E. with his aunt, S.W., and S.W.'s husband, T.W., they indicated they were unable to care for the child.  Furthermore, other

---

[2] J.E. testified that his finances were depleted when he was taking care of his wife, who was then battling stage-4 cancer.

family members declined to care for A.E. because they did not want to deal with J.E. As a result, A.E. was left without a safe or stable home, which led to her removal.

J.E. remained incarcerated for the duration of the underlying proceedings and, on August 1, 2022, he pleaded "guilty" to second-degree-felony possession of a controlled substance in Penalty Group 1 and was sentenced to imprisonment for three years. And while J.E. testified he had an opportunity to be released on parole, he admitted that he was fighting the parole board's request that he complete sex offender education.

J.E. admitted both that it was abnormal to have such a lengthy criminal history and that he "made poor choices." But he nonetheless declined to take responsibility for his continued criminal conduct, which led to his multiple arrests. Moreover, J.E. acknowledged that he was in jail during significant milestones in A.E.'s life, including her birth, the death of her mother, her move to Texas, her fourth birthday, and, presumably, her fifth birthday.

J.E. testified the last time he filed a tax return was in 2018. He also noted that of the three houses he owned in Michigan, "[t]wo of them [he] had to let go back for taxes." He also admitted that he did not look for steady work when he moved to Texas and had no interest in doing so because he was taking care of A.E. and grieving his wife's death. But he explained that when he did work, he made about $120 per day doing side jobs, such as cutting wood and selling copper. J.E. stated that he was financially "broke" at the time of trial.

The record further reflects that J.E. was involved with the Michigan Child Protective Services due to his incarceration and, after he moved to Texas, he had at least nine Department intakes related to A.E. and refused to cooperate with the Department with regard to his being drug tested. And, in at least one instance, J.E. refused to allow Department investigators access to A.E. Moreover, the jury heard testimony that J.E. and A.E. lived with S.W. and T.W. for five months, were homeless before moving in with J.E.'s father, who has schizophrenia, lived in a stolen travel trailer, and, ultimately, moved into a trailer house with repair needs.

J.E. testified that he purchased fifty acres of land for $30,000 cash, but he admitted the property was not in his name. In contravention to these statements, the jury also heard testimony from Roberts that J.E. allegedly was "squatting" on that property. According to J.E.'s testimony, however, once he was paroled, he would live with two people who have been "support people" for him. He admitted this would be a temporary arrangement but stated that he planned to move

6

in with a friend's mother who had an extra room for him and A.E. to use. Ultimately, according to J.E., he and A.E. would live on the fifty acres of land.

J.E. admitted at trial that he could not care for A.E. at that point in time. And while he claimed his friend's mother was ready and able to care for A.E., he offered no details of any agreement with this person, any details regarding how he ultimately planned to care for A.E., or how her basic physical, emotional, and day-to-day needs would be met. Moreover, Department Conservatorship Worker Demetria Daniel testified that J.E. failed to demonstrate an ability to provide financially for A.E or to provide her with a safe and stable home, and he had no plan to care for her.

From this evidence, we conclude that the jury reasonably could have developed a firm belief or conviction that J.E.'s instability "casts doubt" on his ability to care for A.E., thereby subjecting her to a life of uncertainty and endangering her physical and emotional well-being. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (long history of irresponsible choices is probative evidence that parent has engaged in conduct that has endangered child even when actions not directed toward child); *R.W.*, 129 S.W.3d at 739; *see also In re S.I.H.*, No. 02-11-00489-CV, 2012 WL 858643, at *5 (Tex. App.–Fort Worth Mar. 15, 2012, no pet.) (mem. op.) (parent's inability to offer child stable housing more than year after removal and lack of employment history casts doubt on parent's ability adequately to provide for child and supports finding of endangerment). Furthermore, the jury reasonably could have developed a firm belief or conviction that J.E.'s chronic history of incarceration and current incarceration resulted in his repeated absence from A.E.'s daily life and his inability to provide support to her, which negatively impacted A.E.'s living environment and emotional well-being. *See Boyd*, 727 S.W.2d at 533–35; *In re M.R.J.M.*, 280 S.W.3d 494 (Tex. App.–Fort Worth 2009, no pet.) (while imprisonment alone is not basis to terminate parental rights, it is appropriate factor to consider because when parent is incarcerated, he is absent from child's daily life and unable to provide support for child, which negatively impacts child's living environment and emotional well-being); *see also In re J.F.-G.*, 627 S.W.3d 304, 312–13 (Tex. 2021); *In re A.F.*, No. 07-19-00435-CV, 2020 WL 2786940, at *7 (Tex. App.–Amarillo May 29, 2020, pet. denied) (mem. op.). Lastly, based on its consideration of J.E.'s pattern of criminal activity, imprisonment, and instability, the jury reasonably could have developed a firm belief or conviction that J.E. engaged in a deliberate course of conduct, which endangered A.E.'s

emotional and physical well-being. *See* **Walker**, 312 S.W.3d at 617 (if imprisonment of the parent displays voluntary, deliberate, and conscious course of conduct, it qualifies as conduct that endangers child).

### *Violent Behavior*

The record reflects that J.E. was described as having a temper and was observed yelling and cursing at A.E. on numerous occasions. T.W. described J.E.'s treatment of A.E. as verbal abuse. When asked whether he observed J.E. physically abuse A.E., T.W. stated that he and S.W. "wondered where her bruises" came from. Similarly, A.E.'s paternal-great-grandmother, B.S.J., testified she saw signs A.E. was being abused and noticed she had black eyes on several occasions.

J.E. admitted that he yelled and cursed at A.E. and acknowledged that this was "not healthy" for her. He further admitted that he "could improve on" his communication with A.E. and "should act more appropriate." J.E. recounted an incident which occurred in March 2021, when, while A.E. was present, he got into a "screaming match" with his nineteen-year-old stepdaughter and threatened to "beat her ass." J.E. further acknowledged that he screamed in then-three-year-old A.E.'s face, "I'm tired of your [f*cking sh*t]," and "[your f*cking] ass trying to run [sh*t]." A video of this incident appears in the record. J.E. admitted A.E. was screaming, crying, and exceedingly traumatized by this incident. But he nonetheless denied his behavior endangered A.E.'s emotional well-being and claimed A.E. was screaming and crying "[b]ecause she wanted to stay with her sister" and "was upset that we were leaving." J.E. further denied that his behavior was abusive.

The record also supports that J.E. has a history of physical altercations with family members, including with his father, his brother, and T.W. These altercations occurred both before and after A.E.'s birth and have occurred in her presence. In October 2021, J.E. chased down and engaged in a physical altercation with a man who stole personal property from his home. As a result, J.E. was stabbed in the chest and required trauma surgery, as did the other man. J.E. claimed A.E. was not present when this occurred; T.W. testified she was, in fact, present at the home. Moreover, approximately one month before trial, J.E. sent T.W. a letter, which conveyed that "there would be problems if things didn't go right." T.W. testified that he understood the letter to be a threat related to his testimony at the termination hearing. J.H., who

is A.E.'s foster parent, testified J.E.'s behavior made him nervous and caused him to consider installing security cameras.

J.E.'s Department history includes an intake for physical abuse of A.E. But the record reflects that J.E. refused to cooperate and the case was ruled "unable to determine." J.E.'s criminal history includes charges for felony assault on a police officer, aggravated assault, home invasion, disturbing the peace, and witness tampering, which J.E. clarified "actually [was] a domestic violence." J.E. also admitted he has been accused of rape. J.E. testified that he routinely carried a black-powder pistol because, as a convicted felon, he was not allowed to carry a regular firearm.

Based on our review of the record, we conclude that the jury, based on its consideration of the myriad instances of J.E.'s mistreatment of A.E., could have developed a firm belief or conviction that J.E. endangered her emotional and physical well-being and inferred that J.E.'s treatment of A.E. would continue in the future, especially in light of J.E.'s refusal at trial to accept responsibility for the effect his behavior had on A.E. *See C.H.*, 389 S.W.3d at 540; *C.J.O.*, 325 S.W.3d at 265; *see also In re M.M.M.*, No. 01-21-00269-CV, 2021 WL 5365102, at *10 (Tex. App.–Houston [1st Dist.] Nov. 18, 2021, pet. denied) (mem. op.) (evidence that parent has engaged in abusive or violent conduct in past permits inference that violent behavior will continue in future). The jury also could have considered the numerous instances wherein J.E. exposed A.E. to violence and developed a firm belief or conviction that his actions demonstrated a conscious disregard for her safety and emotional well-being. *C.J.O.*, 325 S.W.3d at 265; *see also C.W.*, 2015 WL 1967945, at *2–3; *In re A.V.W.*, No. 13-12-00684-CV, 2013 WL 1932887, at *5 (Tex. App.–Corpus Christi May 9, 2013, pet. denied) (mem. op.) ("It is self-evident that parents perpetrating violence toward members of the family threaten the emotional development and well-being of any child"); *In re M.V.*, 343 S.W.3d 543, 547 (Tex. App.–Dallas 2011, no pet.) (allowing children to remain in abusive environment created by domestic violence supports termination under subsections (D) and (E)); *B.J.B.*, 546 S.W.2d at 677.

*Neglect*

Multiple witnesses testified that while in J.E.'s care, A.E. ordinarily appeared dirty, had not been bathed in days, had unkempt hair, and was not clothed appropriately. J.E. testified there was nothing wrong with letting A.E. run around in only underwear or a diaper. While he

claimed he took A.E. to bathe at friend's or family's homes, the campground, or in the lake, he admitted he ordinarily "bathed" A.E. only with wet wipes every other day.

The record reflects J.E. did not have enough diapers, clothing, or bedding for A.E. and routinely housed her in a location that lacked running water and electricity. Roberts testified about an intake allegation that A.E. was routinely observed defecating in the front yard. J.E. stated that their home was "kind of trashy," which required that they spend a lot of time outside.

The evidence also supports that J.E. failed to supervise A.E. properly. J.E. described how he allowed A.E. to ride her "Power Wheels" battery operated vehicle on a track he built for her, which looped around a house that was being demolished. Notably, J.E. also allowed A.E. to go outside alone with a woman who lived with a methamphetamine user, who subsequently disappeared with her. J.E. testified that he suspected drug use in the woman's home but allowed A.E. to go with her nonetheless. J.E. claimed that he was watching A.E. on his video cameras but did not see the woman, who had a glass pipe and lighter in his backyard, set his yard on fire, steal his pistol from his truck,[3] or kidnap A.E.

From this evidence, the jury reasonably could have developed a firm belief or conviction that J.E. neglected A.E.'s basic, physical and health needs by exposing her to unsanitary living conditions, failing to ensure she was clean, forcing her to live in a home without running water, and failing to supervise her properly, thereby endangering her physical and emotional well-being. *See Boyd*, 727 S.W.2d at 533; *see also In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *17 (Tex. App.–Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.) (parent's failure to protect or supervise her young children endangers the children's physical or emotional well-being); *In re A. R. R.*, No. 01-18-00043-CV, 2018 WL 3233334, at *5 (Tex. App.–Houston [1st Dist.] July 3, 2018, pet. denied) (mem. op.) (lack of running water in home jeopardized children's physical and emotional well-being); *In re G.H.*, No. 02-17-00193-CV, 2017 WL 4683925, at *8 (Tex. App.–Fort Worth Oct. 19, 2017, no pet.) (mem. op.) (holding evidence sufficient to support finding parent engaged in conduct that endangered child's physical and emotional well-being where parent provided unsanitary home and failed to ensure child was clean); *In re R.D.H.*, No. 12-03-00390-CV, 2005 WL 1000617, at *5-6 (Tex. App.–Tyler April 29, 2005, no pet.) (mem. op.) (considering evidence children were dirty, smelled bad, and had uncombed hair in holding evidence sufficient to support finding that mother placed or allowed

---

[3] J.E. further testified he sometimes left his pistol in his truck, where it was alleged A.E. frequently played.

her children to remain in environment that endangered their physical and emotional well-being); *In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.–Amarillo 2003, no pet.) (considering evidence of a child's continued uncleanliness and home without running water in its endangerment analysis).

*Drug Use*

Roberts stated J.E. reported he was addicted to heroin from 2002 through 2008 and was "taking medication that would block him from getting high." However, at trial, J.E. claimed he took this medication for back pain. Daniel stated that J.E. admitted to using drugs "toward the beginning of the case" but claimed he was "trying to do better." Despite allegations and continued concerns that J.E. was using drugs, J.E. repeatedly refused to submit to drug testing. At trial, J.E. denied that he ever used drugs, including methamphetamine and heroin. Nonetheless, he admitted he took an opioid addiction class in jail. Further still, while J.E. stated he was financially "broke" at the time of trial, he denied that he spent all his money on drugs.

In May 2021, when officers seized the stolen trailer in which J.E. and A.E. were living, they found a glass water pipe used for inhaling methamphetamine under the pillow on which J.E. was lying when they arrived. J.E. testified that he and A.E. shared the same bed, and the investigating officer testified that the pipe beneath J.E.'s pillow would have been within A.E.'s reach. Officers also located a bag of marijuana and methamphetamine along with J.E.'s medications in a basket on the kitchen table, and J.E. later pleaded "guilty" to second degree felony possession of a controlled substance in Penalty Group 1 of between four and two hundred grams.

Moreover, as noted above, in October 2021, J.E. allowed A.E. to be alone with a person he knew lived with a methamphetamine user. He stated he later found a glass pipe and lighter in the back yard, but rather than hand the items over to police when they were investigating, according to J.E., he smashed them in his fire pit[4] with a hammer.

Based on the evidence of J.E.'s drug history and drug-related criminal conduct, the jury reasonably could develop a firm belief or conviction that he engaged in conduct that subjected A.E. "to a life of uncertainty and instability, thereby endangering her physical and emotional well-being" because of the possibility that he could be impaired while caring for her and that his involvement with drugs resulted in his incarceration. *See Walker*, 312 S.W.3d at 617–18; *In re A.B.*, 125 S.W.3d 769, 777 (Tex. App.–Texarkana 2003, pet. denied) (history of drug abuse

---

[4] J.E. also testified A.E. liked to get charcoal and sticks from the fire pit to write on herself.

represents "conduct that subjects the children to a life of uncertainty and instability, thereby endangering their physical and emotional well-being); *see also* **Castaneda v. Tex. Dep't of Protective and Regulatory Servs.**, 148 S.W.3d 509, 522 (Tex. App.–El Paso 2004, pet. denied) (conduct of parent or another person in home can create environment that endangers physical and emotional well-being of child as required for termination under subsection (D)); **R.W.**, 129 S.W.3d at 739. The jury further could have considered J.E.'s repeated refusal to submit to drug testing and determined that he would have failed those drugs screens. *See In re K.-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.–El Paso 2018, no pet.). The jury also was able to consider evidence of J.E.'s drug use before A.E.'s removal, his exposing A.E. to drugs and drug users, and his refusal to accept responsibility for his actions even after he was arrested and pleaded "guilty" to possession. Thus, the jury reasonably could have developed a firm belief or conviction that J.E.'s drug use and drug-related criminal activity endangered A.E.'s physical or emotional well-being. *See In re B.M.S.*, 581 S.W.3d 911, 917 (Tex. App.–El Paso 2019, no pet.) (evidence of drug-related criminal activity by parent supports conclusion that children's surroundings are endangering to their physical or emotional well-being); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.–Fort Worth 2003, no pet.) (inappropriate, abusive, or unlawful conduct by persons who live in child's home or with whom child is compelled to associate on regular basis in her home is part of "conditions or surroundings" of child's home under subsection (D)); *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.–San Antonio 1998, pet. denied) (parent's or caregiver's illegal drug use supports a conclusion that child's surroundings endanger their physical or emotional well-being).

Moreover, the jury was entitled to disbelieve J.E.'s claim that he never used drugs and the drugs found among his things did not belong to him. *See J.F.C.*, 96 S.W.3d at 266. Specifically, the jury could consider his testimony that he was taking a medication used to treat addiction despite his claim he used the drug for back pain, his refusal to submit to drug testing, his failure to turn over the paraphernalia he found in his backyard to police, the glass water pipe found under his pillow, the drugs found in a basket alongside his medications, and his plea of "guilty" to drug possession. *See id.* The jury also could have determined J.E. was aware of the danger posed by his drug use given his testimony both that his uncle died from an overdose and that he witnessed people in and out of jail due to drugs, but that he disregarded the risk, thereby further endangering A.E. *See In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.–Tyler 2003, no pet.) (it is

not necessary that parent know for certain that child is in endangering environment; rather, awareness of potential for danger and disregard of risk is sufficient to show endangering conduct).

*Untreated Mental Illness*

J.E. was diagnosed with Bipolar I disorder in 2008 after he met with a psychologist and a psychiatrist. In November 2021, J.E. admitted himself to a mental health hospital. He testified that he did so to undergo "grief counseling and possible medication." He denied threatening to kill himself and claimed his statement that he missed his deceased wife and wanted to be with her was misunderstood. B.S.J. observed J.E. display symptoms of schizophrenia, and it was alleged on one of the several Department intakes J.E. possibly was suffering from post-traumatic stress disorder. Roberts testified she had concerns for J.E.'s mental health, among other things.

J.E. testified he had "tried many medications," including Depakote, which made him "extremely violent". He stated he later took Lithium and Effexor "off and on" for ten or twelve years. Victoria Grounds, a physician's assistant who treated J.E., testified Lithium was used to treat bipolar disorder and schizophrenia. J.E. claimed he was taken off his medications by a doctor he saw in the Texas Department of Criminal Justice (TDCJ). He further stated that "[a]ll the providers" he had seen in TDCJ believed his bipolar disorder either had "resolved" itself or was misdiagnosed. He testified that at the time of trial, he was not taking any medication for mental health issues and stated, "The only time that I ever felt normal was when I came off the medication."

Based on this evidence, we conclude that the jury reasonably could develop a firm belief or conviction that J.E. suffers from untreated mental health issues and his failure to avail himself of the mental health treatment endangered A.E. *See S.R.*, 452 S.W.3d at 363 (untreated mental illness can expose child to endangerment and is factor fact finder may consider); *In re L.L.F.*, No. 02-1-00485-CV, 2012 WL 2923291, *15 (Tex. App.–Fort Worth July 19, 2012, no pet.) (mem. op.) (considering parent's failure to take medication to treat mental health issues as factor in creating environment that endangers child's emotional or physical well-being).

**Summation**

We have reviewed the evidence in the light most favorable to the jury's findings, have assumed the jury settled disputed facts in favor of its findings, and have disregarded evidence that a reasonable fact finder could have disbelieved. *See J.F.C.*, 96 S.W.3d at 266. Having done

so, we conclude, as set forth in detail above, that the jury reasonably could have developed a firm belief or conviction that the termination of J.E.'s parental rights as to A.E. was appropriate based on his knowingly allowing A.E. to remain in conditions or surroundings, which endangered her physical or emotional well-being. *See* TEX. FAM. CODE ANN. §§ 107.007, 161.001(b)(1)(D). Moreover, we conclude, as set forth in detail above, that the jury reasonably could have developed a firm belief or conviction that termination of J.E.'s parental rights as to A.E. was appropriate based on multiple instances of his engaging in conduct or his knowingly placing A.E. with persons who engaged in conduct that endangered her physical or emotional well-being. *See* TEX. FAM. CODE ANN. §§ 107.007, 161.001(b)(1)(E).

Furthermore, we have considered the entirety of the evidence of record, both that which supports and that which is contrary to the jury's findings and have considered whether the disputed evidence is such that a reasonable fact finder could not have reconciled such disputed evidence in favor of its findings. *See id.*; *C.H.*, 89 S.W.3d at 27–29. The evidence contrary to the jury's findings largely consisted of J.E.'s testimony, which we conclude is such that a reasonable fact finder could have reconciled it in favor of its findings. *See In re J.F.C.*, 96 S.W.3d at 266. As a result of our review, we conclude that the jury reasonably could form a firm belief or conviction about the truth of the evidence offered in support of the Department's allegations.

Based on the foregoing, we hold that the evidence is legally and factually sufficient to support the trial court's judgment terminating J.E.'s parental rights to A.E under subsections (D) and (E). J.E.'s first issue is overruled.[5]

## DISPOSITION

Having overruled J.E.'s first issue, we ***affirm*** the trial court's judgment.

**GREG NEELEY**
Justice

Opinion delivered July 31, 2023.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

---

[5] Because we have overruled J.E.'s first issue, we do not consider his second issue of whether the evidence is sufficient to support the termination of his parental rights to A.E. under Texas Family Code, Section 161.011(b)(1)(O). *See* TEX. R. APP. P. 47.1; *In re N.G.*, 577 S.W.3d 230, 237 (TEX. 2019).



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JULY 31, 2023**

**NO. 12-23-00096-CV**

**IN THE INTEREST OF A.E., A CHILD**

Appeal from the County Court at Law No 1
of Henderson County, Texas (Tr.Ct.No. FAM-22-0039-CC1)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, for which execution may issue, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*